**UNITED STATES of America, Plaintiff,**

v.

**STATE OF WASHINGTON, Defendant.**

**No. 9213.**

United States District Court,
W.D. Washington.

Dec. 18, 1995.

Christopher Pickrell, Asst. U.S. Attorney, W.D. Wash., Seattle, WA, for Co-counsel for U.S.

Allan E. Olson, Sharon I. Haensly, LaConner, WA, for Swinomish Indian Tribal Community.

William A. White, Asst. U.S. Atty., U.S. Dept. of Justice, Indian Resources Section, Environment & Natural Resources Div., Washington, DC, Co-counsel for U.S.

Mason D. Morisset, Morisset, Schlosser, Ayer & Jozwiak, Seattle, WA, for Tulalip Tribes.

Kevin R. Lyon, Olympia, WA, for Squaxin Island Tribe.

Richard Reich, Eric Nielsen, Office of the Reservation Attorney, Taholah, WA, for Quinault Tribe.

Phillip E. Katzen, Allen H. Sanders, Evergreen Legal Services, Seattle, WA, for Jamestown, Lower Elwha, Pt. Gamble Bands of Klallams, Nisqually, Nooksack, Sauk-Suiattle, Skokomish, Squaxin Island, Stillaguamish Tribe, and Upper Skagit Tribes.

Annette M. Klapstein, John Howard Bell, Debra S. O'Gara, Law Office, Puyallup Tribe, Tacoma, WA, for Puyallup Tribe.

Daniel A. Raas, Harry L. Johnsen, Andrea S. McNamara, Bellingham, WA, for Lummi Tribe.

Bill Tobin, Vashon, WA, for Nisqually Indian Tribe.

Jack W. Fiander, In-House Counsel, Yakama Indian Nation, Toppenish, WA, for Confederated Tribes and Bands of the Yakama Indian Nation.

Robert L. Otsea, Jr., Laura Ann Lavi, Office of the Tribal Atty., Auburn, WA, for Muckleshoot Tribe.

Peter C. Monson, Indian Resources Sect., Denver, Environment & Natural Resource Division, U.S. Dept. of Justice, Denver, CO, Co-Counsel for U.S.

Kathryn Nelson, Amy C. Lewis, Eisenhower, Carlson, Newlands, Reha, Henriot &

Quinn, Tacoma, WA, for Pt. Gamble James-town & Lower Elwha Bands of S'Klallam and for the Skokomish Tribe.

Marc Slonim, John Arum, Richard Berley, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, for Makah Tribe.

John Sledd, Suquamish, WA, for Suquamish Tribe.

Vernon Peterson, Regional Solicitor's Office, U.S. Dept. of Interior, Portland, OR, Co-counsel for U.S.

Leslie Barnhart, Quileute Natural Resources, LaPush, WA, for Quileute Tribe.

Nettie Alvarez, Richard Ralson, Seattle, WA, for the Hoh Tribe.

John W. Hough, Sr., Asst. Atty. Gen., Olympia, WA, for State of WA.

Robert K. Costello, Asst. Atty. Gen., Jay Geck, Olympia, WA, for Depts. of Fisheries & Wildlife.

Robert Zuanich, Seattle, WA, for Amicus Curia Puget Sound Vessel Owners Assoc. and Gary Westman.

Paul L. Anderson, Anderson & Peterson, Seattle, WA, for WA Trollers Assn.

Jeffrey Jon Bodé, Bellingham, WA, Co-Counsel for Nooksack Tribe.

Mary Linda Pearson, Suquamish, WA, Co-Counsel for Suquamish Tribe.

Edward G. Maloney, Sedro Wooley, WA, Harold Chesnin, Mathews Garlington–Math-ews & Chesnin, Seattle, WA, for the Upper Skagit Tribe.

Robert C. Hargreaves, Asst. Atty. Gen., Olympia, WA, Co–Counsel for State of WA.

Steven Marshall, Perkins Coie, Bellevue, WA, Al Gidari, Michael Himes, Perkins Coie, Seattle, WA, for Intervenors Puget Sound Shellfish Growers.

Malcolm L. Edwards, Edwards, Sieh, Hathaway, Smith & Goodfriend, Seattle, WA, Co–Counsel for Intervenor–Defendants Alexander, et al.

Eric Richter/John A. Roberts, Skeel, Henke, Evenson & Roberts, Seattle, WA, Co-Counsel for Intervenor Defendants Adkins, et al.

Harold P. Dygert, Asst. Atty. Gen., Office of the Attorney General, Joseph S. Monte-cucco, Jay D. Geck, Asst. Attys. Gen., Shell-fish Division, Olympia, WA, Co–Counsel for the State of WA.

James M. Johnson, Olympia, WA, Co-Counsel for Intervenors 26 UPOW.

Daniel W. Wyckoff, Olympia, WA, for Amicus Curiae Inner Sound Crab Association.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO ALTER OR AMEND THE JUDGMENT

RAFEEDIE, District Judge.

### Introduction

The Court issued an Order on August 28, 1995, *United States v. Washington*, 898 F.Supp. 1453 (W.D.Wash.1995), implementing its interpretation of the Stevens Treaties between a number of Indian tribes and the State of Washington.[1] Pursuant to Fed. R.Civ.P. 59, the United States and the Tribes have moved to amend or alter the Order on five grounds: (1) the selection process of Special Masters is flawed; (2) the denial of Tribal access across private land is in conflict with Supreme Court authority; (3) the minimum density figure of manila clams is in error; (4) the definition of "cultivated" shell-fish beds is too broad; and (5) the provision allowing the imposition of damages against the Tribes is legally erroneous.

For the reasons that follow, the Court HEREBY GRANTS the motion as to the selection process of the Special Masters, the denial of Tribal access across private land, and the damages provision, and HEREBY DENIES the motion as to the minimum density figure of manila clams and as to the definition of cultivated shellfish beds.

---

1. The Court's interpretation of the Treaties is set forth in the memorandum opinion in *United*

*States v. Washington,* 873 F.Supp. 1422 (W.D.Wash.1994).

### Standard for Altering or Amending Judgments

■ A motion to alter or amend a judgment is made pursuant to Fed.R.Civ.P. 59(e). The grounds for reconsideration of a judgment are: "if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School District No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994).

In this case, the moving parties do not argue that there is newly discovered evidence or that there has been an intervening change in controlling law. Thus, the Court need only consider whether the challenged aspects of its Implementation Order involve clear error or are manifestly unjust.

### Discussion

### I. Special Master Selection Provision

Dispute resolution is governed by § 9 of the Implementation Order. Each of the following groups is entitled to designate one Special Master: the Tribes; the State of Washington; the Shellfish Growers; and the Private Property Owners. Any group may change its designation upon thirty (30) days' notice. § 9.1.

The four Special Masters serve as a panel for disputes; however, in a dispute, one Master is selected randomly to hear the dispute.

### 1. Challenges to the Provision

The United States and the Tribes argue that § 9 of the Implementation Order presents three problems. First, they argue that the pool of four Masters is tilted three to one against the Tribes, and therefore in any dispute they are three times less likely to have a Master biased in their favor selected than one who is biased against them.

Second, the moving parties argue that § 9 violates Fed.R.Civ.P. 53—which governs the designation of Special Masters—because Rule 53 contemplates that the Court will select the Master, whereas § 9 allows the parties to do so.

Finally, the United States and the Tribe argue that § 9 is unconstitutional because it violates the Tribes' due process rights by having their disputes resolved in front of biased decisionmakers, particularly since there is no provision for judicial review of the Master's decision.

### 2. Analysis

#### a. Three to One Bias

■ Although the moving parties present a superficially compelling argument that the pool of Special Master is biased against them at three to one odds, their analysis is exaggerated. Assuming that the parties all designate Special Masters who are biased in favor of the designators—a bias that has yet to be shown [2]—the odds are not three to one that the Indians will draw an adverse Master.

Instead, the proper analysis is to consider the possible disputes that will arise. Each of the other parties is adverse to the Tribes, but not necessarily aligned with the others. Consider, for example, a dispute between the Tribes and the Private Property Owners. The only Masters selected by interested parties are the ones designated by the Tribes and the Owners. Thus, there is a 50 percent chance that the dispute will be heard by a Master selected by a party with no interest in the dispute (the State and the Shellfish Growers). There is a 25 percent chance that the Master selected will be that designated by the Tribes and a 25 percent chance that the Master selected will be that designated by the Owners—equal odds.

Indeed, to adopt the United States' proposal of allowing the Tribes to designate three Masters (out of six) in the pool would actually tilt the odds in favor of the Tribes. Under this proposal, the Tribes would have a 50 percent chance of having one of their Masters resolve any dispute, while the defendant party would have only a 16⅔ percent

---

2. Whether the selection process as currently formulated in the Implementation Order leads to the selection of biased Special Masters is a different question that may not be entirely ripe for presentation.

chance of having its Master selected. Only 33⅓ percent of the time would the dispute be resolved by a Master selected by a noninterested party. The United States' proposal is obviously inferior to the Court's current scheme.

### b. Rule 53

Rule 53(a), which governs the appointment of Special Masters, states in relevant part as follows: "The court in which any action is pending may appoint a special master therein."

There is little practical difference between § 9 of the Order and a system whereby the parties nominate Masters to be selected by the Court.

It appears that what troubles the United States the most is that the Order provides no guidance for what sort of qualifications are necessary or even desired in the Masters. Also troubling the United States is the provision that Masters can be "undesignated" by the designating party without Court approval.

### c. Due Process

Finally, the parties cite a number of cases for the proposition that decisionmakers must be unbiased and impartial. *Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1669–70, 72 L.Ed.2d 1 (1982); *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973).

The Ninth Circuit has not addressed this issue since 1962, when in *United States v. Lewis,* 308 F.2d 453 (9th Cir.1962), it held that disqualification of land commissioners were within the discretion of the district court unless "actual bias has been demonstrated beyond reasonable possibility of disagreement." *Id.* at 457. *Lewis* recognized that: "Those qualified to act as commissioners in a particular area are likely to have had prior association with those qualified as expert witnesses from that area."

In light of the language of Fed.R.Civ.P. 53 and cases such as *Morgan v. Kerrigan,* 530 F.2d 401 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 2649, 49 L.Ed.2d 386 (1976); *Rios v. Enterprise Ass'n Steamfitters Local 638,* 860 F.2d 1168 (2d Cir.1988), which all involved district court selection of Special Masters, the Court will amend § 9 of the Implementation Order.

## II. Access Across Privately Owned Land

In the 1994 Decision, the Court rejected application of the *Shively* presumption to the Stevens Treaty. The *Shively* presumption "holds that any pre statehood grant of property does not include tidelands unless the grant clearly indicated that tidelands were included." *Washington,* 873 F.Supp. at 1443. The Court noted that in previous cases, the Supreme Court had declined to apply the *Shively* presumption to Indian treaties. *Id.* at 1444 (citing *United States v Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 66 49 L.Ed. 1089 (1905); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 678–80, 99 S.Ct. 3055, 3070–71, 61 L.Ed.2d 823 (1979) (*Fishing Vessel* )). The Court did not hold specifically that the Indian tribes had a right of access across private property, but the rejection of the *Shively* presumption suggested that the right existed.

In the Interim Order, the Court, having been presented with evidence, held that the Indian tribes had no right of access across privately owned tidelands, *unless* they specifically requested permission from the landowner or an Order from the Court. Interim Order, at 2.

Finally, in the Implementation Order, the Court foreclosed all access across private land: "There shall be no upland access to the private tidelands. The Tribes may access the private tidelands by water, across public lands, or by public rights of way only. Nothing in this Plan, however, shall prevent a Private Property Owner from voluntarily agreeing to upland access, although no Tribe has a right to insist on such access from the Tideland Owner." *Washington,* 898 F.Supp. at 1473, at § 7.2.4.

The Court denied Tribal access across private property for two reasons. First, the evidence at trial showed that the Tribes had reached the tidelands by boat and not by land access. Second, the Court took into account equitable considerations and balanced the Tribes' right to fish against mini-

mizing the intrusion on private property. The Court's ruling sought to avoid the conflict that would be generated by allowing the Tribes to cross privately owned property.

Nevertheless, the Court believes that, upon proper showing of the need for land access, the Tribes would be entitled under *Winans* to cross private property in order to exercise their fishing rights. Resolving the issue of Tribal access across private property requires the balancing of competing interests, and the Court emphasizes that land access is not to be granted unless there is a proper showing of the need for such.

The Court will modify its Order so as to allow land access to be an issue brought before a Special Master.

### III. Minimum Density of Manila Clams

■ In the Implementation Order, the Court held that "a natural shellfish bed is a bed which is capable of sustaining a yield of shellfish that will support a commercial livelihood." For manila clams, the Court considered the evidence presented at trial and concluded that minimum density was 0.5 pounds per square foot. The Court used the low end of the figures, as there was evidence at trial indicating that the minimum density might be as high as 1.15 pounds per square foot. *Washington*, 898 F.Supp. at 1461.

The Court did not determine the minimum densities for other types of shellfish, leaving that issue for the parties to agree on by consent or to resolve through the Order's dispute resolution mechanism.

The Tribes argue that the Court's ruling concerning the minimum density of clams for commercial harvest is not supported by the evidence, because there is deposition testimony to the effect that the minimum density might actually be as low as 0.25 or even 0.125 pounds per square foot. (E.g., Depositions of Duane Fagergren, William J. Taylor, David McMillin). The Tribes claim that the data submitted to the Court overinflated the minimum density, because it is based on the density of all clams, rather than mature clams only.

The moving parties do not claim to have newly discovered evidence, nor do they claim that there has been a change in the intervening law or legal error. The Tribes had an opportunity to present counter-evidence and opted not to do so. Based on the record before it, the Court cannot say that the 0.5 pounds per square foot figure will result in manifest unjustness.

Accordingly, the Court DENIES the motion to amend that portion of the Order.

### IV. Definition of "Cultivated" Bed

■ The Court's Implementation Order defines "staked or cultivated" shellfish beds to include all beds that are developed aggressively or passively by the Growers—in other words, artificial beds. Once a bed is determined to be artificial, it retains its artificial character. The significance of this determination is that these artificial beds are exempt from Tribal harvesting. *Washington*, 898 F.Supp. at 1462.

One factor that led the Court to adopt such a broad definition of "cultivated" beds was that "the Court [could not] with any degree of certainty or precision, know what shellfish beds would exist had the Growers never commenced their farming activities." *Id.* A second factor was that the Court did not believe that "the Tribes should benefit from the Grower's efforts." *Id.*

The Tribes complain that this aspect of the Implementation Order is unfair because it restricts them from too much of the Puget Sound shellfish beds. They claim that the Court can determine the state of beds prior to cultivation by the Growers by examining the clam bed surveys conducted by the State of Washington prior to the leases to the Growers.

Since the Tribes are not presenting the Court with new evidence, their only legal basis for altering or amending the judgment is manifest injustice. However, the Tribes have not made any such demonstration in their papers. The entire basis of their claim is that it is possible to determine the pre-cultivation densities.

However, the Court has already considered this argument and rejected it, as stated explicitly in the Implementation Order. The Tribes have not presented sufficient evidence

to show that this ruling creates manifest injustice.

Accordingly, the Court DENIES the motion to amend that portion of the Order.

## V. Damages Provision

Finally, the Tribes argue that the provision of the Order granting Special Masters the authority to award damages against Tribes violates their sovereign immunity and is thus manifest error in law.

■ Indian tribes have a broad grant of sovereign immunity—indeed, as broad as that of the United States. *Oklahoma Tax Comm'n v. Potawatomi Indian Tribe*, 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991); *Rehner v. Rice*, 678 F.2d 1340, 1351 (9th Cir.1982) (en banc). Tribes cannot be sued without their unequivocal consent. *Potawatomi*, 498 U.S. at 509, 111 S.Ct. at 909.[3]

In *Potawatomi*, the issue was whether an Indian tribe that brought suit, seeking injunctive relief against Oklahoma's proposed tax assessment on cigarette sales by the tribe, had waived its sovereign immunity to past taxes owed. The Supreme Court held that the district court properly held that Oklahoma could require the tribe to collect sales taxes on sales to non-Indians in the future, but could not collect such past taxes owed. In other words, the Supreme Court held that by bringing a claim for injunctive relief, the tribe had waived its sovereign immunity to injunctive relief against it, but not monetary awards for past conduct.

■ The State of Washington relies on *United States v. Oregon*, 657 F.2d 1009 Cir.1981), to argue for an opposite result. Aside from the fact that *Oregon* is an older case and a level below the Supreme Court, *Oregon* does not stand for the proposition that intervention in a suit by an Indian tribe waives the tribe's sovereign immunity to damages. In *Oregon*, the issue was whether the intervention by the Yakima tribe as a plaintiff in a suit to enforce fishing rights under treaty opened the tribe up to injunc-

tive relief against it. The Ninth Circuit held that the tribe had assumed the risk that its position would not be accepted, and it was bound by the adverse order. *Id.* at 1015. However, *Oregon* does not hold that intervention in a suit for injunctive relief leaves the tribe open to damage awards against it.

Accordingly, the Court amends that portion of the judgment authorizing Special Masters to assess damages against Tribes.

## Conclusion

The Court's Implementation Order of August 28, 1995, is HEREBY AMENDED to be superseded in the following relevant parts:

7.2.4 No land access to the privately owned tidelands will be permitted. All tribal access must be by boat, public road, or public right-of-way. Thus, Tribal members shall have no right to go upon or cross private property inland of the high water line, unless such access is specifically requested from and granted by a Special Master pursuant to the dispute resolution mechanism set forth in § 9 of this Implementation Order. The Special Master shall not grant access across private property unless the Tribal members can demonstrate the absence of access by boat, public road, or public right-of-way.

.     .     .     .     .

9.1 Selection of a Special Master

The parties shall designate persons ["designees"] to serve as Special Masters. One person shall be designated by each of the following: [a] the Tribes; [b] the State of Washington; [c] the Shellfish Growers; and [d] the Private Property Owners. The four designated persons shall serve as a panel of Special Masters for purposes of this dispute resolution procedure; however, a single Special Master will hear and determine each dispute referred to the panel. The Clerk of the Court shall conduct a random drawing to select the Special Master from the panel for each dispute.

*Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)).

---

**3.** However, individual tribal members are not protected by tribal sovereign immunity. *Potawatomi*, 498 U.S. at 514, 111 S.Ct. at 911–12 (citing

9.1.1 In designating its designee, each group is to provide the name, address, phone number, qualifications, and relevant previous employment and activities to the Court and to the other parties.

9.1.2 No designee shall become a Special Master unless approved by the Court. In the event a designee becomes unable or unwilling to continue service, the party that designated that individual shall designate a replacement within thirty days of the termination of the prior designee's service. Any party may change its designee upon thirty days' notice to the other parties.

9.1.3 Any party may challenge a designee before the Court has approved that person as a Special Master or after having brought a matter for dispute resolution but prior to the selection of a Special Master. The challenge shall be by motion to the Court, and may be on an expedited schedule if the party applies for permission. Challenges shall be made only for actual bias on the part of the Special Master.

. . .

9.2.5 The Special Master shall issue a written report and recommendation stating the decision and the reasons for the decision within ten working days of the conclusion of the hearing or the submission of evidence by the parties to the dispute, whichever is later, unless agreed otherwise by the parties and the Special Master. In fashioning resolution to a dispute, a Special Master shall have no authority to eliminate the Treaty fishing rights of an entire Tribe or to impose damages against a Tribe. The Special Master may, however, implement some other appropriate injunctive remedy and may assess damages against individual Tribal members who damage private property during the exercise of fishing rights.

.    .    .    .    .

9.2.8 The Special Master's report and recommendation shall resolve the dispute when approved and adopted by the Court.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve, by telefax or by United States mail, copies of this Order on counsel for the parties in this matter.