**LAWRENCE AVIATION INDUSTRIES, INC., Petitioner,**

v.

**Robert REICH, Secretary of Labor, Respondent.**

**No. 95CV5377 (JS).**

United States District Court,
E.D. New York.

Aug. 7, 1998.

John J. Hart, Pelletreau & Pelletreau, Patchogue, NY, for Petitioner.

Sanford M. Cohen, Susan L. Riley, Assistant United States Attorneys, Brooklyn, NY, for Respondent.

### MEMORANDUM AND ORDER

SEYBERT, District Judge.

Petitioner Lawrence Aviation Industries ("LAI") is a manufacturer of sheets of titanium alloy used in building jet aircraft and is a former government subcontractor with the United States Department of Labor (the "DOL"). After a compliance review from the DOL's Office of Federal Contract Compliance Programs ("OFCCP"), the OFCCP initiated an administrative action on March 31, 1987 against LAI based on LAI's alleged failure to comply with Executive Order 11246, prohibiting all government contractors from engaging in a pattern or practice of discrimination in employment. In particular, the OFCCP challenged LAI's hiring practices in 1981 on a finding that LAI had not hired a single woman from the 28 applicants that year, while it had hired approximately 20% of the male applicants. After a full hearing before an Administrative Law Judge ("ALJ") and a further determination after a remand from the Secretary of Labor, the Secretary issued a final order dated November 9, 1995, which found that LAI had engaged in a pattern of intentional gender discrimination and awarded backpay in the aggregate amount of $74,577.67, prejudgment interest in the amount of $105,559.16, and ordered LAI to make payment of this

award within 60 days or be debarred from future government contracts.

LAI now seeks administrative review pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706 of the Final Order dated November 9, 1995 of respondents Robert Reich, the Secretary of Labor and the Department of Labor. For the foregoing reasons, the decision of the Secretary is affirmed.

## FACTUAL BACKGROUND

The following facts are set forth as provided in the government's statement pursuant to Local Rule 56.1 (formerly Rule 3(g)) and are not disputed except as indicated.

### I. *PROCEDURAL BACKGROUND*

As a government subcontractor, LAI was subject to the requirements of Executive Order 11246 (the "E.O.") and the regulations promulgated thereunder. *See* Note, 42 U.S.C. § 2000e. The E.O. requires government contractors to agree to abide by nondiscrimination rules and to subscribe to several government contract provisions, including the following:

> The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin.... The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

The Secretary of Labor is responsible for securing compliance with this E.O. by all government contractors and subcontractors. In this regard, the Secretary has designated the OFCCP to oversee the Department of Labor's efforts to secure compliance with the E.O. and its regulations.

The OFCCP conducted a compliance review of LAI's employment practices in 1983 and determined that in 1981, LAI had engaged in a pattern or practice of discrimination on the basis of sex.[1] OFCCP and LAI were then unable to resolve LAI's alleged sex discrimination in employment through conciliation efforts. Consequently, OFCCP filed an administrative complaint against LAI with the Office of Administrative Law Judges of the Department of Labor on March 31, 1987. The complaint alleged that LAI had violated the E.O. by engaging in a pattern or practice of sex-based employment discrimination in 1981 and by failing to remedy the discrimination through payment of backpay to the victims of that discrimination.

Following pretrial discovery, a trial was held before ALJ Aaron Silverman of the Department of Labor. LAI was represented by counsel at the trial, which lasted for twelve trial days. LAI had the opportunity to cross-examine OFCCP's witnesses,[2] to call witnesses in its behalf, and to introduce documentary evidence and expert testimony in defense of OFCCP's claim of discrimination.

Judge Silverman rendered a Recommended Decision and Order ("R. D. & O.") on May 31, 1991. The ALJ recommended that the Secretary of Labor find that LAI had engaged in a pattern or practice of sex discrimination in employment by treating the 28 women who applied for entry level jobs unequally with men and failing to hire them in 1981. As a remedy, the ALJ recommended that the Secretary of Labor order LAI to pay back pay to each of the 28 women in the amount of $2,000, although he did not recommend that the Secretary of Labor require LAI to pay prejudgment interest on the back pay. The ALJ's determination of the backpay award was based on the median length of employment of all men hired in 1981, which was 12.5 weeks, at a rate of $4.00

---

**1.** Petitioner denies that OFCCP challenged a pattern or practice and asserts in the alternative that OFCCP sought an illegal affirmative action program. *See* Discussion, *infra.*

**2.** Petitioner claims that his counsel was not able to cross-examine the government's investigator regarding the thirteen women applicants who were not called to testify. Tr. 476, 518. *See infra* Discussion regarding procedural due process.

per hour for a 40 hour week. Finally, the ALJ recommended that the Secretary of Labor deny OFCCP's request for an order requiring LAI to pay the back pay within 60 days or be debarred from further Government contracts and subcontracts.

Following submission by LAI and OFCCP of exceptions to the ALJ's R.D. & O., the Secretary of Labor rendered a Decision and Remand Order on June 15, 1994. ("D. & R. O."). In the D. & R.O., the Secretary adopted the ALJ's recommended finding that LAI had engaged in a pattern or practice of sex discrimination in employment. The Secretary, however, rejected the ALJ's recommended backpay calculation. The Secretary concluded that under a nondiscriminatory selection procedure, LAI would have hired 6 of the 28 female applicants in 1981 (roughly 20% of the women who applied). He also found that the period of back pay should be determined pursuant to a formula that (1) establishes the period of back pay as beginning with the median date of hire of the 175 male hirees and continuing to the median date of termination of the 41 men who were involuntarily discharged through company layoffs (thus not including those men who resigned or were fired), (2) calculates the average hourly wage of the 41 men, and (3) multiplies that hourly wage by the number of hours that six women would have worked between the two dates. In this regard, the Secretary found that the backpay should include shift differentials, periodic wage increases and fringe benefits that the ALJ had excluded from the back pay calculations. In addition, the Secretary decided that the gross backpay amount should be divided equally among all 28 women and that LAI should pay interest on the back pay. Finally, the Secretary found that LAI should be required to pay the back pay within 60 days or be barred from further Government contracts or subcontracts.

After reaching this determination, the Secretary remanded the proceeding to the Office of Administrative Law Judges for further recommended findings in accordance with the remand order. Following additional submissions by LAI and OFCCP, Acting Chief Administrative Law Judge John M. Vittone issued a Recommended Decision and Order on Remand on July 27, 1995. ("R. D. & O. R."). Applying the back pay formula that the Secretary of Labor found was applicable, Judge Vittone determined that the median length of employment for the 41 men who the company laid off was 61.29 weeks, or 2,451.60 hours, multiplied that by the compensation rate (for wages and benefits) of $5.07 per hour, and multiplied that figure by 6, the number of women who would have been hired based upon their representation in the applicant pool, for a gross back pay amount of $74,577.67. The ALJ determined that the interest due on the gross amount was $105,-559.16, for a total amount due the women of $180,136.88. Dividing that sum by 28, the ALJ determined that LAI must pay each woman $6,433.46 by providing 28 checks in that amount payable to the employees of the U.S. Department of Labor. Judge Vittone further recommended that LAI be required to pay the back pay with interest within 60 days or be debarred from future government contracts and subcontracts.

Following submission by LAI and OFCCP of exceptions to the Recommended Decision and Order on Remand, the Secretary of Labor issued a Final Decision and Order ("F. D. & O.") on November 9, 1995, adopting Judge Vittone's recommendations in their entirety.

## II. EVIDENCE BEFORE THE SECRETARY[3]

In 1979, a fire destroyed a large part of LAI's factory, causing the company to lay off half of its employees. Following rebuilding of the plant, LAI began hiring again. (Tr. 375).[4] Among the openings LAI filled were

---

**3.** The Court has carefully reviewed the transcript of the hearing and finds the Government's statements as described in its Rule 56.1 statement to be an accurate reflection of the record. To the extent the petitioner disputes these facts, it is so noted.

**4.** For sake of ease, the Court will utilize the same method of denoting transcript references as stated in the government's Rule 56 .1 statement. Thus, "Tr." refers to the transcript of the hearings before Administrative Law Judge Silverman. Due to a transcription error, the transcript of the hearing of January 30, 1989 begins with page

entry level blue-collar positions in machine operation and other factory work. Those positions required no previous training and the workers who filled them received limited on-the-job training. (Tr. 303–04, 308, 780; PX4; DX17; DX87, at 7). The newly hired workers normally started as "General Factory Helpers" or "Maintenance Helpers." (Tr. 837–38, 1139).

Workers hired into those positions held them on a probationary basis for the first thirty days of employment. (*Id.*; PX3B). During the thirty day probationary period, the new hires were assigned to various jobs on an "as needed" basis. (Tr. 838; PX3B). At the end of the probationary period, they were assigned to one of the company's positions identified in the company's collective bargaining agreement with the International Association of Machinists. (Tr. 838; PX3B; DX11). All of the men hired in 1981 were classified as "Maintenance Man General Utility" or "Heat Treater & Metal Cleaner." (PX5; PX6). Those positions fell into an "operative" job category (PX11), a category of "workers who operate machine or processing equipment or perform other factory-type duties of intermediate skill level which can be mastered in a few weeks and require only limited training." (DX108, p. 6).

During 1981, twenty-eight women applied for the entry level blue-collar jobs, but LAI did not hire any of them. Tr. 303, 334. At the same time, LAI hired 175 of 849, or approximately 20%, of the male applicants for entry level blue-collar jobs. Tr. 303, 309, 317–18, 334; PX6. Late in 1981, LAI began to lay off the men that it had hired in 1981. By the end of 1983, all but two of the 175 men had been laid off. (PX5B; PX6; DX9; DX16).

John Rowane was Assistant to the General Manager/Vice–President of LAI, Gerald Cohen, during 1981. In that position, Mr. Rowane interviewed job applicants, maintained personnel records and oversaw the compa-

ny's "Affirmative Action Programs." (Tr. 751–54). Mr. Rowane interviewed nearly all the applicants for operative positions in 1981 (Tr. 808–10), and was ultimately responsible for hiring them under the direction of Gerald Cohen. (Tr. 1731).

Fifteen of the 28 female women who applied for entry level blue collar positions in 1981 testified at the hearing. (Jan. 30 Tr. 19–21, 59, 89–94, 134; Tr. 8–11, 40–44, 74–86, 90–94, 117, 136–39, 153–54, 160–62, 169–72, 211–13, 252, 274). The employment applications of all 28 women were received in evidence. (PX 10). Each of the women applied for an unskilled position and was denied a job and each of the jobs for which the women applied remained open until they were filled by male applicants. (PX7, PX16, DX113)

Jacqueline Cox, one of the 28 female applicants, testified about her experience when she applied for a factory job as follows: She testified that on May 22, 1981, she completed an application, gave it to a receptionist, and waited for her name to be called for an interview. (Tr. 76). While she waited, "quite a few" male applicants arrived, completed applications, were interviewed, and left with job offers. (Tr. 77–79). She twice asked the receptionist when she would be interviewed, and each time the receptionist told her to wait. (Tr. 77). After waiting an hour and a half, Mr. Rowane conducted an interview. Mr. Rowane told her that the job was not "fit for a woman" because it involved heavy lifting, dirty conditions and night-work.[5] (Tr. 84). Ms. Cox stated that she had done heavy work before, and was willing to do it again, and that she did not mind that the job entailed working at night or dirty work. She asked for a chance to show that she could do the job. (*Id.*) Mr. Rowane then encouraged her to seek secretarial work. Ms. Cox told him that she had done secretarial work, did not enjoy it, and was interested in the factory job. Mr. Rowane persisted, asking her how quickly she could type. (Tr.

"1" as does the transcript of the hearing of January 31, 1989. The transcripts of the hearing dates following January 31, 1989 are paginated in sequence through page 1907. Accordingly, references to the transcript for January 30, 1989 arc be denoted by "Jan. 30 Tr." "PX" refers to

Plaintiff's Exhibits introduced by OFCCP during the hearings before ALJ Silverman. "DX" refers to the exhibits introduced by LAI.

5. Petitioner denies that Rowane made this statement.

85–86). At the end of the interview, Mr. Rowane told Ms. Cox he would call her if there were any job openings. She never heard from him again.[6] (Tr. 86–7).

Margaret O'Keefe Havemann then testified about her experience when she applied for a factory job as follows: On January 7, 1981, responding to a newspaper ad, she went to LAI's Administrative Office, asked for an application, and was told to wait. Mr. Rowane appeared and told her: "You can fill out an application but you are not going to get this job because you are a woman. But you are free to fill out an application anyway if you choose to do so." (Tr. 40). Ms. O'Keefe Havemann, who by the time of the administrative hearing had become a New York City Police Officer, was shocked by the statement. (Tr. 71). She replied that she was a strong, able-bodied person and wanted to fill out the application. (Tr. 42). She completed the application (PX 10), and Mr. Rowane conducted a five minute interview during which he "didn't describe the job in any way" and did not say anything about pay or benefits. (Tr. 45).[7]

Erin Walters testified about her experience when she applied for a factory job as follows: Responding to LAI's classified ad in *Newsday* for "Sheetmetal workers, no experience necessary," she applied for a position at LAI on January 7, 1981. (Tr. 6). After completing an application, Mr. Rowane conducted a 10 minute interview. (Tr. 10). Mr. Rowane asked her, "Why are you applying for this job? This is man's work." (Tr. 8). Mr. Rowane noted that Ms. Walters had attended college, and asked her, "[W]hy don't you apply for office work?" Ms. Walters testified that she told him that she would do office work, but that she was responding to the ad for sheetmetal workers and had done

so "because I had needed a job and I was primarily interested in the benefits that LAI had to offer." (Tr. 8–9). Mr. Rowane did not describe any details of the sheetmetal job other than that "it was man's work, it was heavy work." After the interview, she never received a call from LAI. (Tr. 11).

Dolores Gumbinsky also testified about her experience when she applied for a factory job at LAI. At the suggestion of an LAI employee, she applied for a job at LAI on April 21, 1981. (Tr. 153). After she completed the application, Mr. Rowane interviewed her for five to seven minutes. The interview was "very fast." She testified that:

> [W]hen I went in [Mr. Rowane] told me that—he looked at me, that—right away he said that it had to do with sheet metal and I—he felt that I couldn't do the work. And so, you know, I felt that if the man feels I can't do the work, he's right.
>
> So then right away he changed the conversation and he said to me, "I see that you have some secretarial or clerical skills"—I mean, "clerical skills. How are you?" You know, right away, he changed the conversation.
>
> And I said, "Well, I am rather rusty." And that was—you know, that was the end of the interview, really.

(Tr. 154).[8] Ms. Gumbinsky never heard from LAI after the interview.

The Secretary of Labor credited the testimony of Ms. Cox, Ms. Havemann, Ms. Walters and Ms. Gumbinsky. (D. & R. O., at 3–4 (citing R.D. and O. at 7)).

In response to OFCCP's request for the company's description of blue collar jobs into which LAI hired the applicants in 1981 (PX3A), LAI submitted a set of descriptions for the nine operative titles. (PX4). All nine

---

**6.** Petitioner contends that the reason Ms. Cox was not hired was that she stated she was only interested in working until school began. Tr. 107.

**7.** Petitioner argues that Ms. Havemann's testimony should not have been credited because she was sisters with Erin Walters, another applicant, and their testimony varied and was tainted because they were only seeking compensation offered to them from OFCCP. Tr. 8, 32, 55. In addition, Ms. Havemann testified that she attend-

ed school full time at Suffolk County Community College from September 1980 through June 1984 and so stated in her application to the police department. Tr. 59, 61.

**8.** Petitioner argues that these statements should be disregarded because they reflect a state of mind of the interviewer. Tr. 154. Petitioner also suggests that the decision not to hire Ms. Gumbinsky was based on her diminutive size (4'11" tall and 100 lbs.).

descriptions state that one of the qualifications was that the applicant be a man.[9] In addition, approximately 85% of the men hired in 1981 were placed in the "Heat Treater & Metal Cleaner" operative category. (Tr. 315; PX6). The description for that category read, in pertinent part, as follows:

*Job Requirements*

Man, Spec. Age Required *18*

Hrs. of Wk. (if not reg.)

Reg. Exper. Prev. Jobs Time—None

Apprenticeship—No

(PX, p. 6).

The record also reflects that the company's president, Lawrence Cohen, personally interviewed 72, or 40%, of the 175 men who were hired in 1981, but did not interview even one of the female applicants. (Tr. 891; PX9).

Statistical evidence was also presented at the hearing before the ALJ. Specifically, in 1981, the company hired 20% of the male applicants and 0% of the female applicants. LAI's expert, Dr. Barry Simon, performed two tests for statistical significance of the disparity between male and female hiring rates, the chi-squared test and Fisher's Exact test. Both tests revealed that the disparity was statistically significant. (DX115 at p. 1). Dr. Simon testified that the disparity is "most definitely not due to chance alone ... [Z]ero out of 28 ain't just change." (Tr. 1274). The disparity between the predicted and actual number of women hired in 1981 was 2.9 standard deviations. (D. & R.O. at 3 n. 2). In addition, between 1975 and 1981 LAI hired 1,020, or 20.1% of 5,077 male applicants, while hiring only 2, or 0.9%, of 225 female applicants. (PX11; Tr. 345–53).

The ALJ also heard testimony that during 1981, the company did not have any written standards for evaluating employment applicants. (Tr. 1113–14). Indeed, LAI first set forth "Selection Criteria for Blue Collar Hires" in writing in 1982, during the course of OFCCP's investigation. (PX3B at 2). The criteria were written by Mr. Rowane and stated in relevant part:

The application is the initial basis for selection. There are two main points that are sought. First, some type of factory or warehouse experience, so that the individual is aware of shop conditions, as opposed to office or sales work. Secondly, a background which shows continued and steady work history, and/or education or training, as opposed to frequent changes of short duration.

Final Selection is made during a personal interview, where an attempt is made to evaluate the individual's attitude, ability to do heavy work, interest in becoming a permanent, steady employee, etc.

Nevertheless, Mr. Rowane could not recall how he applied the criteria in 1981.[10] (Tr. 835; Tr. 850; Tr. 882–84). In testifying about the hiring decisions, Mr. Rowane did not call upon his personal recollection, but upon notes made in preparation for his testimony several days before his appearance based solely upon his review of the applications eight years after the events. (Tr. 882–84). On a voir dire examination on the notes from which Mr. Rowane testified, the following exchange occurred:

Q: Yes. And was your—your—the—information you wrote down based solely upon the application?

A: Yes.

Q: And not on your recall at all?

(No response)

You didn't have any independent recollection?

A: Uh no, I couldn't remember things that far back.

Q: Okay.

---

9. Petitioner makes the argument that the word "man" is supposed to be gender neutral as indicated in its collective bargaining agreement, which states that the words "he, his, man" should be understood to mean both sexes.

10. Petitioner claims the record shows that Rowane made an independent judgment for each individual based upon whether or not they fulfilled the criteria which he had established. Tr. 1129. In addition, he testified that he never told any applicant that he would not a hire a woman and stated affirmatively that sex did not enter in any way into the determination to hire. Tr. 870, 843.

A: So I just took the application at face value, whatever information is on there—

Q: All right.

A: —and transferred it onto the worksheet.

Tr. 884.

Mr. Rowane testified that he could not state that he had applied the criteria during 1981. He stated that he did not "recall exactly how I looked at people in 1981 but my feeling now would be that if they were lacking in any one of [the criteria], I wouldn't consider them suitable." (Tr. 1122). In addition, Mr. Rowane didn't know whether Lawrence Cohen reviewed the applicants in terms of whether they were qualified under the criteria. (Tr. 1115). Mr. Rowane also testified that the "criteria" were just generally "in his head" when he conducted the interviews in 1981. (Tr. 1116–17). He did not compare the individuals with the criteria in any organized way (Tr. 1119–20), nor with other applicants when deciding whom to hire. (Tr. 1129). In response to a question whether the criteria "were required elements for applicants to have in order to be hired," Mr. Rowane testified: "I tried to indicate what I thought were the criteria that we would use in evaluating applicants ... But it isn't as though there was any kind of rule established, where I would compare individuals against this rule to see whether they met it or didn't meet it ... or which one of them was more important than the other." (Tr. 1119–20).

The criteria were not fixed guidelines. No particular amount of prior factory or warehouse experience was required. (Tr. 1111). For example, an applicant's education was not "relevant in all cases." (Tr. 1130–31). Moreover, an applicant's ability to perform heavy work was based on the applicant's own assessment (Tr. 1123) and on Mr. Rowane's judgement in view of the applicant's stature. Mr. Rowane considered whether the individual "looked big enough" and made "a subjective evaluation and I would have no fixed criteria in my mind to say that the cutoff point is here, I'd have no way of doing that."

11. Petitioner denies this fact.

(Tr. 1126). The company did not test an applicant's ability to perform heavy lifting. (Tr. 1128).

The record also indicates that the company hired men who did not meet the criteria.[11] (Tr. 1120). In response to a question about the circumstances when an applicant's failure to meet the criteria did not disqualify him, Mr. Rowane testified:

A: [I]n a case where the individual was interviewed by Lawrence Cohen, he would look at the individual and in some cases he would base his decision on the appearance—or not the appearance, the attitude that came through from the interview. And it was his company, he felt he was a good judge of people and he might hire people that wouldn't meet the criteria that I established after he died.

Q: Uh-huh. Because they had a good attitude based upon the interview?

A: It may not be just attitude, it could be that the individual looked sincere and maybe he looked as though he would be a good worker and he came across to Lawrence Cohen as an individual that he felt he would want working in his plant.

(Tr. 1120–21).

Although LAI hired men in 1981 who had no factory or warehouse experience, it denied employment to some women who had factory experience; hired some men who did not have a steady employment history, but denied employment to women who did; and hired some men who did not seek permanent employment while denying employment to women who did. (PX9; PX10). During 1981, LAI also inconsistently used stature as a proxy for strength in determining whether applicants were able to perform heavy work. (PX9; PX10). For example, heavy lifting was rarely a requirement of the job in the seven departments where operatives were assigned other than the chemical processing department. (Tr. 1771–74).

The women applicants also testified that they would have stayed at LAI had they

been hired and wanted the job to obtain the excellent benefits. For example, Erin Walters testified that when she applied to work at LAI, she "needed the money ... wanted the benefits," and, would likely have "stayed a considerable length of time." (Tr. 17 – 18). Margaret O'Keefe Havemann testified that "everybody applied for a job with the intent that they are going to stay there," and that that was her intent when she applied to work at LAI. (Tr. 49). Jacqueline Cox testified that, if LAI had hired her, she would have stayed at the job until she graduated from college in 1983. (Tr. 90, 102). Linda Nociforo testified that, if LAI had hired her, she "would have been there for quite some time because ... the benefits were good." (Tr. 126). Yasmir Zafar testified that, just as she remained for four years at the job she found when LAI did not hire her, she would have stayed at LAI because she wanted to work. (Tr. 144). Dolores Gumbinsky testified that she "needed a good job" and "would have stayed as long as I was able to work." (Tr. 158). Maureen Keena testified that, in 1981, she was looking to establish herself "in a better job, a job where I could learn a trade." (Tr. 220). Ann Maly testified that she intended to stay at LAI when she applied for work. (Tr. 251). Joan Smith testified that, when she applied, she "was looking for a permanent position." (Tr. 279).

## DISCUSSION

Pending before the Court are the parties' cross-motions for summary judgment. The petitioner LAI seeks a reversal of the Secretary's final order and requests an order entered stating (1) that the OFCCP's administrative complaint should be dismissed as imposing an illegal affirmative action plan establishing a quota of female hires; (2) that the OFCCP's administrative complaint is barred by the statute of limitations; (3) that the Secretary failed to sustain its burden of proving illegal gender discrimination; (4) that if discrimination is found, the Secretary's decision is arbitrary and capricious in modifying the initial determination of the ALJ insofar as the Secretary determined that female applicants would have worked until they were laid off and in awarding prejudgment interest. Respondent OFCCP and the Secretary of Labor seek summary judgment dismissing the petition for review on the grounds that the Secretary's decision is supported by substantial evidence and is neither arbitrary, capricious nor an abuse of discretion in enforcing Executive Order No. 11246.

## I. PETITIONER'S ARGUMENTS ON REVIEW

### A. *Affirmative Action Plans in Government Contracts*

The petitioner LAI first argues that the final order of the Secretary must be reversed because the OFCCP's administrative complaint sought to impose an illegal affirmative action plan in the workplace. LAI bases this argument on several letters from OFCCP. First, on January 12, 1983, the Department of Labor sent LAI a letter stating that it had failed to make a good faith effort to recruit women into its workforce and to meet any of the goals in its 1981 affirmative action program in conformance with 41 C.F.R. § 60–2.12. As such, petitioner argues that the determination of the Secretary that six women should have been hired in 1981 establishes an illegal affirmative action requirement where no prior history of sex discrimination had been established. *See City of Richmond v. J .A. Croson Co.,* 488 U.S. 469, 511, 109 S.Ct. 706, 731, 102 L.Ed.2d 854 (1989).

As the government correctly points out, the administrative complaint filed by the OFCCP has nothing to do with LAI's failure to achieve a required quota or to meet the objectives of its affirmative action plan. The government concedes that the 1983 deficiency letter did cite, among the twelve enumerated deficiencies, a failure to meet the goal of hiring six women into operative positions for that year. That deficiency, however, was resolved through conciliation without any litigation. The only deficiency not addressed through conciliation was whether LAI was failing to hire women as a result of a discriminatory personnel policy. In this regard, the OFCCP's administrative complaint filed with the Office of Administrative Law Judges referred only to the past pattern of discrimination and the enforcement proceeding was

intended only to cover that aspect of the deficiency letter. Indeed, a review of the administrative record indicates that the determination of discrimination was focused solely on the allegations of intentional discrimination rather than the failure to comply with any affirmative action plan or quotas. Accordingly, petitioner's challenge to the Secretary's finding as an illegal affirmative action effort is without merit.

### B. *Statute of Limitations for OFCCP Compliance Proceedings*

■ Petitioner also argues that the decision of the Secretary should be vacated because the compliance proceeding against LAI was initiated beyond the 180 day filing requirement under 41 C.F.R. § 60–1.21, which governs the filing of complaints with the OFCCP when an individual is aggrieved by discriminatory practices of a government contractor. Specifically, petitioner argues that the last female applicant applied to LAI on September 30, 1981 and the OFCCP administrative complaint was not filed until March 31, 1987, almost six years later.

The Court notes that ALJ Silverman explicitly rejected this argument in the R.D. & O. on the grounds that § 60–1.21's filing requirements are not applicable to the OFCCP when seeking compliance with government regulations. R.D. & O., at 2 n. 2. The Court agrees. Section 60–1.21 refers solely to individual complaints filed with the OFCCP. The procedure for the OFCCP in commencing an administrative enforcement proceeding when a contractor violates E.O. 11246 is set forth in 41 C.F.R. § 60–1.26 and provides no statute of limitations. Rather, it provides that an administrative enforcement proceeding "may be made when violations [of the Executive Order] have not been corrected in accordance with the conciliation procedures in this chapter, or when OFCCP determines that referral for consideration of formal enforcement (rather than settlement) is appropriate." Accordingly, petitioner's argument that the administrative proceeding was time-barred is without merit.

### C. *Denial of Due Process*

■ Petitioner also argues that it was denied due process because the ALJ refused to allow LAI to cross-examine the government's investigator as to his conversations with female applicants who did not testify at the hearing. Tr. 518. LAI claims that had it been allowed to introduce evidence of the result of those interviews, that statements "would have indicated clearly and beyond doubt that the petitioner did not discriminate against these interviewees."

The Court fails to see how the ALJ's evidentiary ruling that the government's expert could not testify as to hearsay conversations with witnesses who did not testify constitutes a denial of procedural due process. LAI undoubtedly was aware of the names of these women, and has made no allegation that it was denied the opportunity to subpoena these women or take their depositions. *Cf. Richardson v. Perales,* 402 U.S. 389, 404, 91 S.Ct. 1420, 1429, 28 L.Ed.2d 842 (1971) (no denial of procedural due process in administrative judge's reliance on hearsay physician's report where plaintiff did not take advantage of opportunity to request subpoena of the physicians). Accordingly, the Court finds petitioner's procedural due process claim to be without merit.

### D. *The OFCCP'S Burden of Proof*

Petitioner also urges that the Secretary erred in sustaining the finding of the ALJ that LAI had engaged in a pattern of discrimination. Petitioner argues that the government's witnesses offered self-serving statements whereas LAI's primary witness, John Rowane, was extremely credible and assumed a number of responsibilities as LAI's Equal Employment Opportunity Coordinator sometime after 1981.

■ The Government correctly points out that what petitioner is essentially seeking is a *de novo* review for a determination on the merits. Under the APA, however, that is not the proper standard for a court reviewing an agency determination. Rather, as the Government again correctly argues, the Secretary's determination that LAI engaged in a pattern of discrimination is to be reviewed under the substantial evidence standard. As such, the Agency's findings will not be overturned if there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and may exist even

if a court "could draw different conclusions from those drawn by the agency." *Local One, Amalgamated Lithographers of America v. National Labor Relations Board,* 729 F.2d 172, 175 (2d Cir.1984) (citations omitted). Moreover, when the agency's factual findings are "based on the ALJ's assessment of credibility of witnesses, they will not be overturned unless they are hopelessly incredible or they flatly contradict either the law of nature or undisputed documentary testimony." *Kinney Drugs, Inc. v. National Labor Relations Board,* 74 F.3d 1419, 1427 (2d Cir. 1996) (citation omitted); *see also Yellow Freight Systems, Inc. v. Reich,* 38 F.3d 76, 81 (2d·Cir.1994) (credibility findings of ALJ are owed "special deference.").

■ The Government argues, and the Court agrees, that the ALJ's finding, adopted by the Secretary, that LAI had engaged in a pattern of gender discrimination in 1981 is supported by the substantial evidence in the record. As to the credibility of the female applicants, the ALJ credited their testimony that they either had been told that the jobs were not available to women, that the jobs were not appropriate for women or that they were not interviewed but men were. The Court has reviewed the testimony of these witnesses and simply cannot find that their testimony was "hopelessly incredible" or contradicted by any of the evidence other than the statements of Mr. Rowane, whose testimony the ALJ did not credit. In this regard, the Court has also reviewed the testimony of John Rowane and finds that there is nothing to overcome the special deference due the ALJ's determination not to credit his testimony. In addition, other evidence other than testimony supports the finding of a pattern of sexual discrimination. For instance, LAI's own job advertisements specifically state that being a man is one of the job criteria. Although petitioner attempts to explain this reference as gender neutral, such an argument is utterly unpersuasive. The Court recognizes the general penchant to use the terms "he" "his" and "man" as gender neutral. It would stretch the Court's imagination too far, however, to find that a job advertisement that references being a "man" as a hiring criteria is intended to be gender neutral. If the position was truly intended to attract both men and women, there would have been no reference to gender at all. The Court also cannot escape the undisputed statistical evidence that 0% of the female applicants were hired that year, while 20% of the men were. Moreover, LAI's president interviewed 40% of the male applicants, but none of the female applicants. Accordingly, the Court finds that the Secretary's finding that there was a pattern of sexual discrimination is supported by the substantial evidence in the record.

### E. *The Secretary's Remedial Decision*

The petitioner also argues that the decision of the Secretary modifying the ALJ's recommended remedy was an abuse of discretion and was arbitrary and capricious because he unfairly calculated the median length of employment of male employees and improperly imposed an award of prejudgment interest on the backpay award.

#### 1. *Calculation of Back Pay*

LAI argues that it was error to calculate the back pay award on the assumption that female applicants, unlike male applicants, would have worked until the company-wide layoffs. As to this claim, petitioner argues that its expert Dr. Gary Simon testified before the ALJ that the median time on the job for the men who were hired in 1981 was 12½ weeks. In addition, petitioner argues that the ALJ made a decision based on his assessment of the female witnesses as to the length of their potential employment and that it was an abuse of discretion not to use his back pay calculation.

The Secretary rejected the median length of employment approach on the grounds that there was no evidence in the record showing that specific women applicants would have left work for LAI before being involuntarily laid off in 1983. As such, the Secretary properly relied on *Rios v. Enterprise Ass'n Steamfitters Local Union 638,* 860 F.2d 1168, 1176 (2d Cir.1988), and resolved all ambiguities in favor of the employees and found that the affected class was entitled to the presumption that they would have continued to work until they were laid off or terminated for nondiscriminatory reasons. The Secretary

concluded, therefore, that the backpay period would be based on the median date of hire for men in 1981 through the median date of discharge of the 41 men who were involuntarily laid off in·1983 when LAI closed.

■ As an initial matter, there is no dispute that backpay is an appropriate remedy where an employee has been injured because of the action or inaction of her employer. As stated in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), "where a legal injury is of an economic character, [t]he general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury [and] the injured party is to be placed, as near as may be, in the situation he [or she] would have occupied if the wrong had not been committed." *Id.* (internal quotation marks and citation omitted). Furthermore, difficulty in calculating a backpay award does not constitute a circumstance which warrants the denial of backpay. *Cruz v. Local Union Number 3 of the International Brotherhood of Electrical Workers,* 34 F.3d 1148, 1157 (2d Cir.1994) (citing *Moody,* 422 U.S. at 421, 95 S.Ct. at 2373) ("[B]ackpay should be denied only for reasons which ... would not frustrate the·central statutory purpose [of the legislation] of eradicating discrimination ... and making persons whole for injuries suffered through past discrimination.").

■ As the Second Circuit has also found, in determining whether there has been an abuse of discretion in fashioning the backpay remedy, courts are guided by general principles pertinent to Title VII backpay awards. *Rios,* 860 F.2d at 1175 (citing *Berkman v. City of New York,* 705 F.2d 584, 594 (2d Cir.1983)) (while district court has broad power to fashion relief, its discretion is bounded by purposes of Title VII). Since the object of compensatory relief under Title VII is to make the victim whole, courts must "as nearly as possible," " 'recreate the conditions and relationships that would have been had there been no' unlawful discrimination." *Id.* 860 F.2d at 1175–1176 (quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 372, 97 S.Ct. 1843, 1873, 52 L.Ed.2d 396 (1977) (quoting *Franks v. Bow-*

*man Transp. Co.,* 424 U.S. 747, 769, 96 S.Ct. 1251, 1266, 47 L.Ed.2d 444 (1976) (in turn quoting *Local 60, United Bhd. of Carpenters and Joiners v. NLRB,* 365 U.S. 651, 657, 81 S.Ct. 875, 879, 6 L.Ed.2d 1 (1961) (Harlan, J., concurring))). It also follows from the "make whole" purpose that "such remedy as is given should not constitute a windfall at the expense of the employer." *Id.* 860 F.2d at 1176 (quoting *Ingram v. Madison Square Garden Center, Inc.,* 709 F.2d 807, 812 (2d Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 346, 78 L.Ed.2d 313 (1983)).

■ As the Secretary correctly found, once it was determined that the 28 women applicants were victims of a pattern of sexual discrimination in LAI's hiring practices, any " 'uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating [party].' " *Rios,* 860 F.2d at 1176 (citations omitted). The Court has reviewed the record and also notes that there was no evidence regarding the·28 applicants to suggest that they would *not* have worked until the company layoffs in 1983 had they not been subjected to LAI's unlawful hiring practices. The Court finds, therefore, that the Secretary did not abuse his discretion in determining that the victims should be entitled to a backpay period beginning with the average date of hire and concluding with average date of layoff in 1983.

It should also be noted that the Secretary, in the exercise of his discretion in fashioning a remedy, was also fair in other respects. In favor of the women, the Secretary determined that the ALJ's backpay award should have include shift differentials, periodic wage increases and fringe benefits. This finding is completely consistent with the remedial goal in employment discrimination cases discussed above of making the victims "whole." *See Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 145 (2d Cir.1993) (backpay award should include lost salary as well as anticipated raises and fringe benefits), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). In favor of the petitioner, the Secretary also reasonably found that the record did not support a finding that all women would have been hired, and altered the back-

pay award to reflect a total amount based on an equal percentage of women that were hired as were men. Because 20% of the men were hired, the backpay award should reflect an amount based on 20% of the women, or 6 women, working until lay offs occurred in 1983.

### 2. Prejudgment Interest

■ LAI further asserts that the decision awarding prejudgment interest must be reversed. The basis for this argument is that ALJ Silverman originally determined that prejudgment interest was not warranted because (1) while there was discrimination, it was not the "pernicious" type of ethnic discrimination warranting this relief; (2) there was no fixed amount of lost wages and the back pay award, while warranted, was speculative; and (3) LAI did not act in bad faith. LAI further adds that prejudgment interest is unfair because of the Secretary's and the OFCCP's delay in the conciliation and review efforts. Specifically, OFCCP did not file its administrative complaint until six years later in March 1987, the case was not heard for another two years in January 1989, concluded on April 1, 1989 and a decision was not rendered until two years later on May 30, 1991. It then took the Secretary an additional three years to issue the decision to remand on June 15, 1994 and it was not until a year and a half later on November 9, 1995 that a final decision from the Secretary was issued adopting Judge Vittone's July 27, 1995 decision. Thus, LAI argues that it should be not charged with fourteen years of prejudgment interest.

■ The Court finds petitioner's arguments to be without merit. First, there is no abuse of discretion in awarding prejudgment interest on an award of backpay in an employment discrimination case. Under the regulations accompanying the E.O., interest on backpay awards derived from enforcement proceedings is specifically authorized. See 41 C.F.R. § 60–1.26. Moreover, in the employment discrimination context, the Second Circuit has held that "it is ordinarily an abuse of discretion *not* to include pre-judgment interest in a back-pay award." *Saulpaugh*, 4 F.3d at 145. Given that the purpose of back pay is to make the plaintiff

whole, it can only be achieved if interest is compounded. *Id.* The Supreme Court has made clear as well that bad faith is not a required element in making the victim of discrimination whole through an award of backpay with interest. *Moody*, 422 U.S. at 422, 95 S.Ct. at 2374. Accordingly, the Court finds that the Secretary's determination that prejudgment interest was appropriate is not an abuse of discretion.

Second, although there was a delay in the proceedings, the petitioner does not deny that prior to the filing of the administrative complaint, LAI and the OFCCP were engaged in ongoing conciliation efforts. Moreover, LAI has had the benefit of using the monies that otherwise should have been paid to the victims years ago. The Second Circuit very recently rejected an argument similar to LAI's in *Securities and Exchange Commission v. Warde*, 151 F.3d 42 (2nd Cir.1998). In that case, the defendant objected to a district court's award of $1.2 million in prejudgment interest because the SEC was "ultimately responsible" for the nine-year delay in bringing the underlying securities enforcement action. The Second Circuit found the argument to be without merit because "[e]ven if … litigation was protracted through some fault of the [the government]," the award of prejudgment interest for the entire period is proper because 'defendant … had use of unlawful profits for the entire period.' *Id.* 151 F.3d at 50 (citing *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1477 (2d Cir.1996)). Indeed, the purpose of prejudgment interest in an employment discrimination case is to prevent an employer from attempting "to enjoy an interest-free loan for as long as it can delay paying out back wages." *Clarke*, 960 F.2d at 1154 (citation omitted). Accordingly, the Court finds there was no abuse of discretion or unfairness to LAI in awarding the prejudgment interest on the backpay award.

### 3. Debarment from Future Contracts

■ Although it appears that this remedy is no longer an issue in this case, it should be noted as a final matter that the Secretary was within his discretion to order that LAI would be debarred from future government contracts if payment of the award was not

promptly made. The E.O. and its implementing regulations specifically provide the Secretary with the authority to issue such a debarment order. *See* E.O. § 209(a)(2); *see also* 41 C.F.R. § 60–1.27 ("A contractor may be debarred from receiving future contracts ... for any violation of Executive Order 11246.").

## CONCLUSION

For the foregoing reasons, petitioner's motion for summary judgment is denied, respondent's cross-motion for summary judgment is granted and the decision of the Secretary is affirmed in all respects. The Clerk of the Court is directed to mark this case as closed.

SO ORDERED.